# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
#### 1:20 CV 46 MR WCM

| | | |
|---|---|---|
| Q LEVEL, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | MEMORANDUM AND |
| v. | ) | RECOMMENDATION |
| | ) | |
| MOOG MUSIC, INC., | ) | |
| and MOOG INSTITUTE, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the Court on the Motion to Dismiss Amended Complaint (Doc. 44)("Motion to Dismiss") filed by Defendants Moog Music, Inc. and Moog Institute, Inc. (collectively, "Defendants"), which motion has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B). Having carefully considered the parties' arguments, the record, and applicable authority, the undersigned respectfully recommends that the Motion to Dismiss be granted in part and denied in part.

## I.    Procedural Background

On October 17, 2019, Plaintiff Q Level, LLC ("Q Level") filed this action in the United States District Court for the Central District of California. (Doc. 1).

On November 12, 2019, Defendants filed a motion asking that the case be dismissed pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of

Civil Procedure, or in the alternative, that it be transferred to this district. (Doc. 18).

 On December 16, 2019, Q Level filed a motion requesting leave to file a first amended complaint. That motion was granted, and Q Level filed its First Amended Complaint on December 23, 2019. (Docs. 29, 31, & 32).

On January 10, 2020, Defendants filed another motion requesting that the case be dismissed pursuant to Rule 12(b)(2) and Rule 12(b)(6) or transferred. (Doc. 33).

On February 11, 2020, the presiding judge, the Hon. Virginia A. Phillips, found that personal jurisdiction was lacking over Defendants in the Central District of California, declined to reach the merits of Defendants' Rule 12(b)(6) arguments, and granted Defendants' motion to transfer the case to this district. (Doc. 37).

Defendants filed the instant Motion to Dismiss on February 21, 2020. Q Level has responded, and Defendants have replied. (Docs. 48 & 49).

II.   Factual Background

 A. Documents Considered

Defendants filed copies of the subject Memorandum of Understanding ("MOU") (Doc. 18-3) and Q Level's Articles of Organization (Doc. 18-12) in the Central District of California in connection with their previous motion to dismiss. (Doc. 18). These documents may be, and have been, considered in

addition to Q Level's First Amended Complaint (Doc. 32). <u>See</u> <u>Philips v. Pitt</u> <u>Cty. Mem'l Hosp.</u>, 572 F.3d 176, 180 (4th Cir. 2009)(stating that courts may take judicial notice of matters of public record, documents attached to the complaint, and documents attached to the motion to dismiss so long as they are integral to the complaint and authentic).

To the extent there are conflicts between the allegations contained in the First Amended Complaint and these documents, the undersigned has relied on the documents. <u>See</u> <u>e.g.,</u> <u>Tinsley v. OneWest Bank, FSB</u>, 4 F. Supp. 3d 805, 819 (S.D.W. Va. 2014) ("When a document is properly considered in the context of a motion to dismiss and it conflicts with the bare allegations of the complaint, the document prevails.").

### B. Factual Allegations

Q Level is a Nevada limited liability company that organizes and produces music festivals nationwide. Gillian Ryan ("Ryan"), Q Level's sole member, is domiciled in California. Pl.'s First Am. Comp. (Doc. 32) at ¶¶ 6 & 19.

Defendant Moog Music, Inc. ("Music") is a for-profit corporation that manufactures electronic musical instruments. Defendant Moog Institute, Inc. ("Institute") is a non-profit corporation and is the owner of the "Moogfest" trademark. Both Music and Institute have their principal places of business in North Carolina. <u>Id</u>. at ¶¶ 7-8.

Q Level alleges that Music and Institute have the same Board of Directors, President, and Chief Executive Officer, share the same offices and employees, and comingle funds and assets. Music and Institute also work together to facilitate the production of Moogfest. Id. at ¶¶ 9-10.

On September 21, 2018, "RyanCo"[1] and Institute entered the MOU. (Doc. 18-3). Ryan signed the MOU on behalf of RyanCo and Mike Adams ("Adams") signed the MOU as the managing member of "Moog Institute, LLC."[2] (Doc. 18-3) at 6.

The preamble/introductory paragraph of the MOU stated as follows:

> This Memorandum of Understanding ("MOU") sets forth the conditionally binding terms and understanding between the Moog Institute, Inc. ("MoogINS") on the one hand and RyanCo (including its affiliates), company name TBD (collectively, "RyanCo") on the other hand, to license the trademark MOOGFEST (the "Mark") for use in connection with the multi-day music, art and technology festival known as "Moogfest" and derivative events that celebrates the life, work, and spirit of Bob Moog.

---

[1] No information regarding RyanCo's structure appears in the First Amended Complaint.

[2] Adams is also alleged to be the President of Music. Pl.'s First Am. Compl. (Doc. 32) at ¶ 11. The parties do not address the distinction between "Moog Institute, LLC," and "Moog Institute, Inc."

4

Binding condition defined as RyanCo procuring and substantiating financing to produce the festival within 60 days of the date of the execution of the MOU, and come to mutual agreement with the frameworks set forth per the terms of this MOU.

(Doc. 18-3) at 2.

Another section of the document stated that the purpose of the MOU was "to design a framework intended to create a fruitful, good faith, and long-term partnership, the primary goal of which is the profitable operation of Moogfest, which will help create a marketing extension of the MOOG brand and will positively impact Moog Music's return on investment as a title sponsor and help establish a successful event for RyanCo." Id.

Following the preamble, a background section, and the purpose paragraph, the MOU contained three major sections entitled—Terms of License, Operating Agreement, and Other Matters. In the Terms of License section, the MOU indicated that Institute "will grant" RyanCo an exclusive, worldwide, royalty-free annual license to use the Moogfest trademark, which license was to "have a quality control provision consistent with the terms of the operating agreement below" and "a termination provision related to the Operating Agreement." Id. at 2-3.

The Operating Agreement section of the MOU stated that Institute, Music, and RyanCo "will enter into an agreement concerning the running of the event." In that regard, once RyanCo issued a proposal, Institute would have

5

three days to respond "with its reason for not agreeing to the proposal and to provide a counter proposal." <u>Id</u>. at 3. RyanCo agreed not to reject Institute's counterproposal unreasonably but had "the right to make the ultimate decision." <u>Id</u>.

The MOU directed that a future operating agreement include certain terms, such as:

- That the festival would last for a minimum of three days and three nights with the theme(s) of the festival to be mutually agreed upon;

- That as part of the planning for each festival, "specific milestones" would be mutually agreed upon, including initial ticket sale dates and the dates for announcing artists and speakers;

- That RyanCo was responsible for numerous tasks and would retain "100% profits and 100% losses"; and,

- That Music would "enter into a separate sponsorship agreement for each year of this contract" with the amount of the sponsorship and the value Music would receive "to be negotiated separately" subject to minimum amounts stated.

<u>Id</u>. at 3 – 4.

The Other Matters section of the MOU included indemnification and confidentiality provisions. It also stated that the "termination process" was "to be mutually determined given the parameters listed above." Id. at 5.

The last paragraph of the MOU indicated that "a long form agreement based on this MOU will be negotiated in good faith with the goal that it be finalized and executed in no more than 60 days after execution of this MOU." Id.

On September 25, 2018, the Articles of Organization for Q Level were filed. See Articles of Organization, (Doc. 18-12). Q Level alleges that RyanCo is now operating as Q Level.[3]  Pl.'s First Am. Compl. (Doc. 32) at ¶ 2.

In November 2018, the MOU was amended and the "binding condition" language in the preamble was removed and replaced by the following provision: "[l]ong form of agreement to be executed within 60 days of this edit."[4]  (Doc. 18-3); (Doc. 32) at ¶¶ 11 & 22.  Initials for both Ryan and Adams appear next to the amendment and on the signature page; Ryan's initials are dated November 20 and Adams' initials are dated November 27.  See (Doc. 18-3) at 2,6.

Q Level successfully produced and operated the 2019 Moogfest pursuant to the terms of the MOU. (Doc. 32) at ¶ 23.

---

[3] Specific information as to when and how RyanCo's rights and obligations under the MOU were assigned to Q Level has not been provided.

[4] The language of the amendment is similar to the language in the final paragraph of the MOU.

However, despite lengthy negotiations, the parties did not execute a "long form agreement." <u>Id</u>. at ¶¶ 24 – 26.

Further, Q Level appears to allege that "Moog" revoked Q Level's rights under the MOU and refused to allow Q Level to produce Moogfest in 2020 and subsequent years. <u>Id</u>. at ¶ 26.

## III.  Legal Standards

### A. Rule 12(b)(6)

When considering a motion made pursuant to Rule 12(b)(6), the court accepts the allegations in the complaint as true and construes them in the light most favorable to the plaintiff. <u>See</u> <u>Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.</u>, 591 F.3d 250, 253 (4th Cir. 2009); <u>Francis v. Giacomelli</u>, 588 F.3d 186, 192 (4th Cir. 2009).

The court, however, is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." <u>Consumeraffairs.com</u>, 591 F.3d at 255; <u>see</u> <u>Giacomelli</u>, 588 F.3d at 192.  That is, while "detailed factual allegations" are not required, the complaint must contain "enough facts to state a claim to relief that is plausible on its face."  <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007); <u>see</u> <u>Consumeraffairs.com</u>, 591 F.3d at 255. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v.</u>

8

Iqbal, 556 U.S. 662, 678 (2009); accord Consumeraffairs.com, 591 F.3d at 255. In short, the well-pled factual allegations must move a plaintiff's claim from conceivable to plausible. Twombly, 550 U.S. at 570; Consumeraffairs.com, 591 F.3d at 256.

## B. Choice of law

Federal courts sitting in diversity apply the substantive law of the forum state. Castillo v. Emergency Med. Assocs. PA, 372 F.3d 643, 646 (4th Cir. 2004) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). Under North Carolina's choice-of-law principles, "the interpretation of a contract is governed by the law of the place where the contract was made." Schwarz v. St. Jude Med., Inc., 254 N.C. App. 747, 752, 802 S.E.2d 783, 788 (2017)(quoting Tanglewood Land Co. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980)). "[T]he place at which the last act was done by either of the parties essential to a meeting of the minds determines the place where the contract was made." Nytco Leasing, Inc. v. Dan-Cleve Corp., 31 N.C. App. 634, 640, 230 S.E.2d 559, 562–63 (1976)(citing Fast v. Gulley, 271 N.C. 208, 155 S.E.2d 507 (1967)).[5]

---

[5] For purposes of this Memorandum, the undersigned will assume that choice-of-law principles apply similarly to all of Plaintiff's claims. See Scott & Stringfellow, LLC v. AIG Commercial Equip. Fin., Inc., No. 3:10CV825-HEH, 2011 WL 1348324, at *4 (E.D. Va. Apr. 8, 2011)(agreeing that contractual choice-of-law principles should govern the quasi-contractual claims at issue); Neighbors Law Firm, P.C. v. Highland Capital Mgmt., L.P., No. 5:09-CV-352-F, 2010 WL 3767140, at *7 (E.D.N.C. Aug. 16, 2010), report and recommendation adopted, No. 5:09-CV-352-F, 2010 WL 3767126 (E.D.N.C. Sept. 24, 2010)(applying North Carolina's choice-of-law principles to

In this case, the parties argue that the events surrounding the execution and amendment of the MOU occurred in California and North Carolina, though they are not in agreement as to the location of the last act essential to a meeting of the minds regarding the MOU and therefore also disagree as to which state's law should govern Q Level's claims.

Q Level argues that "the last event necessary to make a binding agreement, Plaintiff's signature and acceptance, occurred in California" and therefore "California law ought to apply." Pl.'s Resp. (Doc. 48) at 5.

Defendants contend that the last act occurred in North Carolina. First, they argue that September 21 could not be the relevant date because Q Level did not exist at that time.[6] Second, they argue that Adams was the last party to initial the amendment, that he did so while in North Carolina, and that Q Level produced the 2019 Festival in North Carolina. Defs.' Reply (Doc. 49) at 2.

The choice of law determination could be dispositive for at least one of Q Level's claims; as discussed below, while North Carolina and California courts analyze breach of contract and quantum meruit claims in a similar manner,

_____

determine which jurisdiction's substantive law governs contract, quantum meruit, and implied contract claims).

[6] In support of this argument, Defendants cite <u>Lupo v. Share of N. Carolina, Inc.</u>, 199 N.C. App. 318 (2009), where the North Carolina Court of Appeals considered whether a company could enforce a contract that was entered and performed before the company was incorporated. That case, however, did not address choice-of-law issues.

10

California courts recognize affirmative promissory estoppel claims but North Carolina courts do not.

Yet, the location and the timing of the last act essential to a meeting of the minds between the parties are not clear from the current record.

The face of the MOU indicates that Adams signed the document on September 21, 2018 and a North Carolina address is included as part of his signature block. The MOU indicates that Ryan also signed the document on September 21, 2018 and an address in Marina del Rey is included as part of her signature block.

In the First Amended Complaint, Q Level alleges that "Ms. Ryan negotiated and signed the MOU while in California (as evidenced by the signature block on the document)...." Pl.'s First Am. Compl. (Doc. 32) at ¶ 17. The First Amended Complaint does not, however, allege where Adams was located when he signed the MOU on behalf of Institute on the same date, nor – importantly – does it allege the sequence in which the signatures were affixed by Ryan and Adams on September 21.

As for the amendment, the face of the MOU indicates that Ryan initialed the change on November 20, 2018 and Adams did likewise on November 27, 2018. Neither the First Amended Complaint nor the MOU, however, provide information as to where Ryan and Adams were physically located when they initialed and dated the amendment. Though Defendants argue that Adams

was located in North Carolina on November 27, information to this effect does not appear in the First Amended Complaint or on the face of the MOU, and Defendants have not provided authorities to support an argument that the North Carolina address associated with Adams' previous signature on September 21 could be construed to mean he was in North Carolina on November 27.

Consequently, the undersigned is unable to determine on the existing record the location of the last act of the parties when they executed, and amended, the MOU, and, similarly, the law that governs Plaintiff's claims. See Hill-Rom Servs., Inc. v. Verses Tech., Inc., No. 1:03CV1227, 2006 WL 1540851, at *11 (M.D.N.C. June 2, 2006)("[T]he record fails to provide any more information as to where the last act essential to a meeting of the minds took place by any of the parties. Although the signatures on the License Agreement are contained on separate pages, suggesting it was signed at different times and/or locations, neither signature contains any accompanying date, time, or location. Without such information, it is not possible to determine where the contract was 'formed' under North Carolina's choice-of-law rules."). Therefore, this Memorandum references the laws of both North Carolina and California.

IV. **Discussion**

The First Amended Complaint contains three claims: (1) breach of contract, (2) quantum meruit, and (3) promissory estoppel.

Defendants advance the following arguments in support of the Motion to Dismiss: (1) that Q Level "lumps together" references to Defendants; (2) that Q Level's claim for breach of contract fails; (3) that Q Level's claim for promissory estoppel is not recognized under North Carolina law; and (4) that Q Level's quantum meruit claim is insufficient because there is no allegation that Q Level expected payment from Defendants.

## A. Combined Allegations Against Defendants

Defendants first argue that all of Q Level's claims should be dismissed because Q Level has failed to specify the actions taken by each defendant. Defs.' Mem. (Doc. 45) at 4 – 5.

The "shotgun approach to pleading," in which the plaintiff "does not take the time initially to specify *by name* which defendant [was] being sued in each claim," was disfavored in Jarosiewicz v. Cty. of Rutherford, No. 1:05CV211, 2005 WL 2000238, at *1 (W.D.N.C. Aug. 18, 2005)(emphasis in original). There, a "discrete event" was "turned into an 18-page Complaint, involving

eight causes of action, against five defendants, all of whom appear[ed] to be lumped into each claim." Id.[7]

Defendants' argument on this point is not without merit. The allegations against each defendant could be articulated more clearly; Q Level refers to Institute and Music as "Moog" in a significant portion of the First Amended Complaint. While "the better pleading practice is to specify in each cause of action the name or names of the defendants against whom the claim is asserted," Jarosiewicz, 2005 WL 2000238, at *1 (W.D.N.C. Aug. 18, 2005), particularly considering the recommendations listed below with regard to the individual claims, Q Level's collective references to Defendants in the present circumstances are not of sufficient concern to warrant complete dismissal on that basis.

## B. Individual Claims

### 1. Breach of Contract Claim

Defendants argue that Q Level's breach of contract claim fails because a condition precedent for the fulfillment of the MOU (the execution of a "long

---

[7] A motion to dismiss was pending in Jarosiewicz. The court chose to grant the plaintiff leave to amend his complaint "to clarify what claims he is attempting to assert against which defendants," rather than spending "several days of court time deciding the pending motion."

form agreement") was never met and because the MOU left open material terms for future negotiation.

Q Level disagrees that the requirement for the execution of a "long form agreement" constituted a condition precedent to the enforceability of the MOU, and contends that the MOU "definitively and unambiguously sets out the Parties' obligations in detail… [and] leaves no material terms open for future negotiation."  Pl.'s Resp. (Doc. 48) at 8-9.

### a. North Carolina and California Law

Under North Carolina law, "[f]or a valid contract to exist there must be 'a meeting of the minds as to all essential terms of the agreement.'" McKinnon v. CV Indus., Inc., 213 N.C. App. 328, 333, 713 S.E.2d 495, 500 (2011)(quoting Carcano v. JBSS, LLC, 200 N.C.App. 162, 168, 684 S.E.2d 41, 48 (2009).

> There is no meeting of the minds, and, therefore, no contract, when in the contemplation of both parties … something remains to be done to establish contract relations. This rule has been described as too well established to require the citation of authority. Thus, if negotiating parties impose a condition precedent on the effectiveness of their agreement, no contract is formed until the condition is met. Likewise, when negotiating parties make it clear that they do not intend to be bound by a contract until a formal written agreement is executed, no contract exists until that time.
>
> Parker v. Glosson, 182 N.C. App. 229, 232, 641 S.E.2d 735, 737 (2007) (internal citations and quotations omitted).

15

Similarly, under California law, "[c]ontract formation requires mutual consent, which cannot exist unless the parties agree upon the same thing in the same sense." Bustamante v. Intuit, Inc., 141 Cal. App. 4th 199, 208 (2006) (citing Civ.Code, §§ 1580, 1550, 1565)(quotations omitted). "If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation." Id. (quoting Weddington Productions, Inc. v. Flick (1998) 60 Cal.App.4th 793, 811, 71 Cal.Rptr.2d 265).

Further

> Under California law, a contract will be enforced if it is sufficiently definite (and this is a question of law) for the court to ascertain the parties' obligations and to determine whether those obligations have been performed or breached. To be enforceable, a promise must be definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages. Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable.
>
> Bustamante v. Intuit, Inc., 141 Cal. App. 4th 199, 209, 45 Cal. Rptr. 3d 692, 699 (2006) (internal citations and quotations omitted).

### b. Enforceability of the MOU

The undersigned does not agree with Q Level that the MOU "definitively and unambiguously sets out the Parties' obligations in detail… [and] leaves no

material terms open for future negotiation." First, it does not appear that Music was a party to the MOU. The document stated that it set forth the "conditionally binding terms" between Institute and RyanCo (Doc. 18-3) at 2, but did not mention Music in that regard. Further, the MOU was signed by Adams on behalf of Institute and by Ryan on behalf of RyanCo. A separate representative of Music did not execute the MOU or the subsequent amendment, and Q Level does not provide sufficient factual allegations to indicate that Adams, when signing for Institute, was also attempting to bind Music.

Second, the MOU referenced issues on which agreement had not been reached, including the parameters of quality control and termination provisions for the license, numerous terms relating to an operating agreement that would be entered, and a "termination process" that was "to be mutually determined." With regard to the operating agreement in particular, the MOU explained a process whereby RyanCo would issue a proposal and Institute would have three days to respond and provide a counter proposal, with RyanCo having "the right to make the ultimate decision."

Third, both the last paragraph of the MOU and the subsequent amendment referenced a "long form agreement" that was to be negotiated and executed subsequently. Such an agreement, however, was never completed.

Under these circumstances, there was no "meeting of the minds as to all essential terms of the agreement," Carcano v. JBSS, LLC, 200 N.C.App. 162, 168, 684 S.E.2d 41, 48 (2009)); the MOU "is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained." Bustamante v. Intuit, Inc., 141 Cal. App. 4th 199, 209, 45 Cal. Rptr. 3d 692, 699 (2006).

Consequently, the MOU is unenforceable. See Hous., Inc. v. Weaver, 305 N.C. 428, 444, 290 S.E.2d 642, 652 (1982)(quoting Boyce v. McMahan, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974)("A contract to enter into a future contract must specify all its material and essential terms. If any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement."); Eriz v. Rodas, No. B186196, 2006 WL 3393620, at *3 (Cal. Ct. App. Nov. 27, 2006)("Generally, no enforceable agreement exists if the parties reserve an essential element for future agreement. Stated otherwise, an agreement to agree is no agreement.").

### 2. Quantum Meruit Claim

#### a. North Carolina and California Law

The North Carolina Supreme Court has stated that "*[q]uantum meruit* operates as an equitable remedy based upon a quasi contract or a contract implied in law which provides a measure of recovery for the reasonable value of services rendered in order to prevent unjust enrichment." Ron Medlin Const.

18

<u>v. Harris</u>, 364 N.C. 577, 580, 704 S.E.2d 486, 489 (2010)(internal quotations omitted). "To recover in *quantum meruit*, [a] plaintiff must show: (1) services were rendered to defendants; (2) the services were knowingly and voluntarily accepted; and (3) the services were not given gratuitously." <u>Clark v. Burnette</u>, No. 19 CVS 8565, 2020 WL 469428, at *6 (N.C. Super. Jan. 28, 2020)(quoting <u>Envtl. Landscape Design Specialist v. Shields</u>, 75 N.C. App. 304, 306, 330 S.E.2d 627, 628 (1985)).

Under California law:

> To recover in quantum meruit, a party need not prove the existence of a contract, but it must show the circumstances were such that the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made. The requisite elements of quantum meruit are (1) the plaintiff acted pursuant to an explicit or implicit request for the services by the defendant, and (2) the services conferred a benefit on the defendant.
>
> <u>Port Med. Wellness, Inc. v. Connecticut Gen. Life Ins. Co.</u>, 24 Cal. App. 5th 153, 180, 233 Cal. Rptr. 3d 830, 852 (Ct. App. 2018), <u>reh'g denied</u> (June 6, 2018), <u>review denied</u> (Sept. 12, 2018) (internal citations and quotations omitted).

### b. Expectation of Payment

Defendants do not appear to dispute that Q Level provided services or that Defendants accepted those services. Rather, they argue that Q Level may not recover on this claim because the MOU did not contain any promise of payment from Defendants but rather indicated that RyanCo was to retain

19

100% of the profits and 100% of the losses from the festival. Consequently, Defendants say, to the extent Q Level was not paid from its operation of the 2019 Festival, Defendants are not responsible for that loss. Defs.' Mem. (Doc. 45) at 9.

Defendants are correct that the Operating Agreement section of the MOU stated that a future operating agreement was to include a provision that RyanCo "retains 100% profits and 100% losses." However, as indicated above, quantum meruit is an equitable remedy and an operating agreement of the type described by the MOU was never entered. Further, the First Amended Complaint alleges conduct in relation to festivals other than the 2019 Moogfest. See e.g., Pl.'s First Am. Comp. (Doc. 32) at ¶ 37 (a) (alleging that Q Level repaid outstanding debt owed to vendors from the 2018 Festival).

Therefore, at this stage of the litigation, and considering the allegations in the light most favorable to Q Level, the undersigned concludes that Q Level has stated a plausible claim for quantum meruit.

### 3. Promissory Estoppel Claim

Should North Carolina law apply, this claim would fail because "North Carolina … does not recognize promissory estoppel as an affirmative cause of action." Rudolph v. Buncombe Cty. Gov't, 846 F. Supp. 2d 461, 477 (W.D.N.C.), aff'd, 474 F. App'x 931 (4th Cir. 2012).

In California, however, a plaintiff may plead promissory estoppel in the alternative to breach of contract. Fleet v. Bank of Am. N.A., 229 Cal. App. 4th 1403, 1413, 178 Cal. Rptr. 3d 18, 27 (2014)("Although a cause of action for promissory estoppel is inconsistent with a cause of action for breach of contract based on the same facts, when a pleader is in doubt about what actually occurred or what can be established by the evidence, the modern practice allows that party to plead in the alternative and make inconsistent allegations.")(internal quotations and citations omitted).

Under California law, "[t]he elements of a promissory estoppel claim are (1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) the reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance." Flintco Pac., Inc. v. TEC Mgmt. Consultants, Inc., 1 Cal. App. 5th 727, 734 (Ct. App. 2016)(internal quotations and citations omitted).

Given that it is not clear on the current record which state's law should govern this matter, and further because that decision could be dispositive as to this particular claim, the undersigned expresses no opinion as to the merits of this claim and recommends that the Motion to Dismiss be denied as to it, pending further development of the record.

## V.    Recommendation

For the reasons stated, the undersigned **RECOMMENDS** that Defendant's Motion to Dismiss Amended Complaint (Doc. 44) be **GRANTED IN PART** and **DENIED IN PART** as follows:

1. That the Motion be **GRANTED** as to Q Level's breach of contract claim (Count One) and that such claim be **DISMISSED WITH PREJUDICE**; and

2. That the Motion be **DENIED** as to Q Level's claims for quantum meruit and promissory estoppel (Counts Two and Three).

Signed: June 12, 2020

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(C), and Federal Rule of Civil Procedure 72(b)(2), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140, 140 (1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).